J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Kiran Sekhon (SBN 360474)
ksekhon@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Meghann Percy*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEGHANN PERCY, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br>　　vs.<br><br>OXFORD GLOBAL RESOURCES, LLC, a Massachusetts limited liability company; and DOES 1 through 10, inclusive,<br><br>　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; UNJUST ENRICHMENT** |

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      Defendant Oxford Global Resources, LLC ("Defendant" or "OGR") uses data broker software on its website – http://oxfordcorp.com/ (the "Website") – to secretly collect data about a Website visitor's computer, location, and browsing habits.  The data broker software then compiles this data and correlates that data with extensive external records it already has about most Californians in order to learn the identity of the Website user.  In addition, Defendant and the Website utilize software owned by the social media platform-operating entities X Corp. (formerly Twitter) and LinkedIn Corporation ("LinkedIn") that operates in a substantially similar manner.  Both Defendant and the third-party data collectors involved benefit commercially and financially from this surveillance.  The surveillance and collected user data are used to target Website visitors for specific marketing, among other things.

2.      What's worse than the foregoing is that, after transmitting at least some identifying data to third parties, Defendant made the false promise to Plaintiff and to all visitors to the Website that it would honor their choice to stop such data-sharing. The promise was false because even though Plaintiff, and other visitors, believed that upon opting out of data-sharing using the Website's consent banner their data would not be shared with third parties, the Website continued such data-sharing.

3.      Defendant's installation and use of data broker software, and code supplied by Twitter/X and LinkedIn, without obtaining consent or authorization therefore – both before Plaintiff and visitors encountered a consent banner, and after they interacted with it, selecting to opt out of data-sharing – violated (a) duties Defendant owed to them under the common law and (b) California Penal Code § 638.51, California's Trap and Trace Law.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action pursuant to

CLASS ACTION COMPLAINT
1

the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

5.      Defendant OGR is a Massachusetts limited liability company that provides staffing and business consulting services that ***maintains 3 California offices – in San Jose, Laguna Hills and San Diego, California***. OGR actively markets its services to California businesses and recruits individuals in California to fill positions through the Website and, on information and belief, in other ways.  The Website contains California-specific content relating to California-based positions for which OGR is recruiting designed to attract visitors located in California.  *See* **Exhibit A** hereto.[1]  Defendant maintains ongoing commercial relationships with such California customers and residents.  Defendant derives substantial revenue from California-based transactions through its operation of the Website.  Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website. Defendant intended and understood that such persons would suffer injury in California.

6.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to

---

[1] Exhibit A is a true and correct copy of a search for positions located in California conducted on OGR's website on February 25, 2026, the URL for which is https://www.oxfordcorp.com/all-jobs/?keyword=&location=california&pagenum=1&include_remote=1#results.

CLASS ACTION COMPLAINT

2

personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

## **PARTIES**

7.      Plaintiff Meghann Percy ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California.  Plaintiff maintains reasonable expectations of privacy when browsing websites.

8.      Defendant is a Massachusetts limited liability company that owns, operates, and/or controls http://oxfordcorp.com/ (the "Website") and three (3) California locations.  Through the Website, and its office locations, OGR provides staffing and business consulting services, and recruits individuals to fill positions at OGR's business clients.

9.      Individuals are encouraged by the Website to seek employment opportunities by location.  At the top right hand corner of the homepage of the Website appears a drop down menu entitled, "I AM TALENT."[2] If a visitor clicks on the arrow directly to the write of this title, they are taken to the webpage https://www.oxfordcorp.com/i-am-talent/[3], which invites the visitor to either "Get In Touch" with OGR or "Search Jobs."  If the visitor clicks on "Search Jobs," they land on the webpage https://www.oxfordcorp.com/all-jobs/,[4] which invites them to enter text into two boxes, one containing greyed-out text reading, "Job title or key word", and the other containing greyed-out text reading, "Location."  If a visitor enters the text "California" into the "Location" box and then clicks on a yellow bar entitled "SEARCH JOBS", the visitor retrieves a list of California-based opportunities being

---

[2] *See* www.oxfordcorp.com (last visited 2/25/2026).

[3] (Last visited 2/25/2026).

[4] (Last visited 2/25/2026).

CLASS ACTION COMPLAINT

3

advertised by OGR. The search so described retrieves the webpage captured in Exhibit A hereto.

10.  OGR runs marketing and recruiting campaigns on social media platforms including LinkedIn, X Corp. (formerly Twitter), Google, Facebook and Instagram.  These platforms utilize visitor data – collected by their software that advertising companies such as OGR install on their websites – for targeting advertising benefitting both the advertisers and the platforms.

11.  Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

12.  Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

13.  Defendant is the proprietor of the Website.

14.  The Website, like most other websites, due to code or software programs running on the Website, determines the state and sometimes the city in which its visitors are located – between the time a visitor requests to go to the Website (through clicking a link or typing the its address into the browser address bar), and the time the Website loads on the visitors' screens.  This location gathering occurs separately and apart from the Data Broker software and the social media platform code running on the Website that forms the basis of Plaintiff's claims in this action.

15.    On November 4, 2025, Plaintiff visited the Website.  When she did, data that reasonably likely identified her were transmitted to at least three (3) third parties who used and profited that data, along with Defendant: ZoomInfo, LinkedIn and X Corp.  This occurred through the operation of software and code on the Website **both before and after** (a) Plaintiff told Defendant and the Website that she did not want her data shared or sold and (b) Defendant promised her that it would not share or sell her data.

### Defendant Shares Visitors' Data with ZoomInfo, LinkedIn and X Corp.

16.    Defendant has partnered with at least one registered California data broker, ZoomInfo Technologies LLC ("ZoomInfo"), in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing ZoomInfo code and tools on the Website.

17.    Defendant has also partnered with two social media companies, LinkedIn and X Corp. (Twitter) in order to identify and track visitors to its Website for Defendant's benefit, as well as that of LinkedIn and X Corp., by installing code owned by these companies.

18.    The ZoomInfo code deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed.  The process initiated by the ZoomInfo code identifies visitors through "browser fingerprinting."  Fingerprinting allows data brokers like ZoomInfo to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.  The LinkedIn and X Corp. code deployed on the Website work in similar ways, as described *infra*.

### Browser Fingerprinting

19.    Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings get transmitted to ZoomInfo, LinkedIn and X Corp.?  One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience.  This assumption is simply incorrect.

20.    The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those data brokers and social media companies who you are. (This data is *usually* combined with information such as the webpage you arrived from, and *sometimes* with information already in the hands of data brokers and social media companies including your name and email addresses, as well as other websites you have visited in the past.)

21.    As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[5]

---

[5] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You:

22.    The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a website.[6]

23.    In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[7] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[8]

### The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers

24.    Collection of visitor data by entities such as ZoomInfo, LinkedIn and X Corp. – including collection by these entities of unique identifiers that the ZoomInfo, LinkedIn and X Corp. code assigns to visitors to the websites of

Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

[6] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

[7] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

[8] *Id.*

CLASS ACTION COMPLAINT

7

advertising companies like OGR – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of ZoomInfo, LinkedIn and X Corp and similar organizations.

25. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

CLASS ACTION COMPLAINT

8

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

### Registered California Data Brokers

26.   Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations.  Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

27.   Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

28.   Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual.  The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

29.   Data Brokers are accumulating data and profiling individuals to an alarming extent.  As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:  "We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the

CLASS ACTION COMPLAINT

9

SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[9]

30.    Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

31.    Here, Defendant partnered ZoomInfo, by installing ZoomInfo code onto the Website.  Defendant allows ZoomInfo, and possibly other Data Brokers, to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.

32.    ZoomInfo operates as a data broker, aggregating, AI-analyzing, and selling detailed professional contact information and business intelligence. It builds its massive database by scraping public websites, email signatures, and utilizing third-party data, targeting sales, marketing, and recruiting teams. ZoomInfo has faced scrutiny over its aggressive, often non-consensual data collection methods.

33.    The ZoomInfo code causes signaling, addressing and routing information to be sent to ZoomInfo via electronic impulses emanating from the devices of visitors to the Website.

34.    When a visitor's device communicates with the Website (for example, OGR's name, or the URL of the Website's homepage, is typed into the address (or URL) bar at the top of a browser page), the ZoomInfo code automatically captures and processes technical device, browser, and browser network data (for example a

[9] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 2/22/2026).

CLASS ACTION COMPLAINT

10

household network) transmitted as part of that communication. These include browser type and version, information about the visitor's device and configurations thereof, referring and exit pages and URLs, page views, loads and clicks, and time and date of use.

35. The ZoomInfo code deployed on the Website further enhances traceability by deploying first-party or third-party cookies and unique session or visitor identifiers stored in the visitor's browser. These mechanisms allow Defendant and ZoomInfo to (a) recognize repeat visits even when the visitor's IP address changes; (b) link multiple visits to the same visitor or network; and (c) maintain continuity of tracking over time. This enables prospective tracking of future visits.

36. ZoomInfo promises to prospective businesses: "Find and close your next customer before your competitors do with our all-in-one platform that tells you who to reach and how to reach them." It also promises to help its customers "[g]ain a complete view of [their] customers. Know who they are, what they need, and the best time to reach them."

37. Plaintiff was subjected to the ZoomInfo code as described *supra* starting when she requested that the Website load on her device on November 4, 2025.

### The LinkedIn Insight Tag

38. LinkedIn is an advertising juggernaut. It earns billions each year through advertising. To accomplish this, it must collect tremendous amounts of data from individuals browsing the Internet and identifying them.

39. OGR deploys tracking software owned by LinkedIn known (and referred to herein) as the "LinkedIn Insight Tag." Defendant installed and configured the LinkedIn Insight Tag on its Website to enable covert identification, tracking, and profiling of unsuspecting visitors by LinkedIn, all without their knowledge or consent.

40.     Upon each visitor's arrival on the Website, the LinkedIn Insight Tag immediately initiates data collection by instructing the visitor's device to transmit personal information relating to the visitor, and their device and browser, via electronic impulses to LinkedIn.  The surveillance occurs instantaneously while the first Website page the visitor encounters is in the process of loading – before the visitor has any meaningful opportunity to review disclosures or provide informed consent.

41.     The LinkedIn Insight Tag installed on the Website collects detailed browser fingerprinting data including browser type, version, and configuration settings that create unique device signatures. It captures operating system information including architecture details and version specifications, along with display characteristics such as screen resolution and color depth settings that contribute to device uniqueness.

42.     By deploying the LinkedIn Insight Tag, Defendant actively facilitates the immediate transmission of harvested identifying information from visitors' devices to LinkedIn's servers, including domains such as px.ads.linkedin.com, www.linkedin.com/px/, and snap.licdn.com (the "LI Servers").   Defendant configured the LinkedIn Insight Tag to automatically route this sensitive data to LinkedIn's surveillance infrastructure.  The surveillance alleged herein occurs instantaneously upon the Website loading, before the visitor has any meaningful opportunity to review disclosures or provide informed consent.

43.     The transfer of data from the devices of visitors to Defendant's Website, and the Website to the LI Servers is shown in the screenshot below, taken from Google Chrome's developer tools "network activity" resource:

CLASS ACTION COMPLAINT

12

44.    Defendant deploys the LinkedIn Insight Tag to track all Website visitors, without regard to whether they have LinkedIn account or have ever used LinkedIn services.

45.    Plaintiff was subjected to the LinkedIn Insight Tag as described *supra* starting when she requested that the Website load on her device on November 4, 2025.

**The X Corp. Code**

46.    X Corp has earned at least $1 billion each year through advertising annually in the past 5 years.  It maintains this revenue by collecting massive amounts of data about individuals navigating the internet, and identifying them.

47.    Defendant deploys the X Corp. code on the Website.  The Website is configured such that the X Corp. code starts running as the Website is starting to load on a visitor's screen.

48.    The X Corp. code initiates a sophisticated fingerprinting process that allows for the tracking of visitors without the use of traditional digital identifiers such as cookies. The X Corp. code process collects and combines multiple data

points including device identifiers and configurations (such as installed fonts, screen dimensions and system settings), browser identifiers and and network routing information to create a highly unique digital fingerprint.

49.    Each time a fingerprinted visitor, including Plaintiff and members of the putative class, encountered (and encounters) X Corp. code **embedded on websites other than OGR's**, the visitor is instantly recognized by X Corp. and X Corp.'s profile on the visitor is enhanced and updated.  The X Corp. code effectively generates surveillance trackers that enable comprehensive monitoring of visitors' online activities and creates detailed user behavioral profiles.

50.    Plaintiff was subjected to the X Corp. code as described *supra* starting when she requested that the Website load on her device on November 4, 2025.

### Troubling Implications of Third-Party Data Sharing

51.    Companies using third-party tracking software – such as the ZoomInfo and X Corp. code, and the LinkedIn Insight Tag described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them.  However, there is no guarantee that consumer data supplied to Data Brokers or social media platforms will be used solely for advertising purposes.

52.    As a Data Broker, ZoomInfo can use data it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

53.    A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their

exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[10]

54.    There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[11]

55.    Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[12]

56.    This month, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[13]  No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

57.    The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information

---

[10] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[11] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[12] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

[13] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[14]

58.    As Attorney General Bonta explained in the *Sephora* case:

The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

**Data and Related Profiles of Consumers Have Economic Value**

59.    The type of visitor data transmitted via the Website to ZoomInfo, LinkedIn and X Corp. have economic value – as it obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website.  The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by

---

[14] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

Defendant's deployment of the ZoomInfo and X Corp. code, and the LinkedIn Insight Tag, on the Website.

60.    The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and Class members.  For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[15]

61.    As recently explained by the Law Institute:[16]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational

---

[15] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

[16] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

62.    There exists an established market for the type of personal data collected through the ZoomInfo, LinkedIn and X Corp. code and tags running on the

Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

**The Consent Banner on the Website Defrauds Visitors, Including Plaintiff**

63.    Upon landing at OGR's Website, Plaintiff was presented with a banner stating the following:

> We use cookies to ensure the best experience possible on
> our website. These cookies share information about your
> use of our site with our partners to create a more
> personalized experience and provide relevant advertising
> for you, in addition to web analytics for us. By clicking
> "OK, got it" or continuing to navigate our site, you agree
> to our use of cookies. For more information please see
> our Privacy Policy.

Beneath this text were two buttons, one highlighted in yellow stating, "OK, got it." And another not highlighted stating, "Do Not Sell My Personal Information." Plaintiff clicked the button stating, "Do Not Sell My Personal Information."

64.    When she clicked that button, a new banner appeared on her device, which bears in green letters "onetrust," and which stated:

> Do Not Sell My Personal Information
>
> When you visit our website, we store cookies on your
> browser to collect information. The information collected
> might relate to you, your preferences or your device, and

CLASS ACTION COMPLAINT

19

is mostly used to make the site work as you expect it to and to provide a more personalized web experience. However, you can choose not to allow certain types of cookies, which may impact your experience of the site and the services we are able to offer. Click on the different category headings to find out more and change our default settings according to your preference. You cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, to log into your account, to redirect you when you log out, etc.). For more information about the First and Third Party Cookies used please follow this link.

65. Beneath this banner were the words "More Information," which were underscored. Clicking on "More Information" causes your device to go to the following website: cookiepedia.co.uk/giving-consent-to-cookies, which bears the headline "Cookie Notices and Cookie Consent Explained."

66. Beneath the text "More Information" appeared a yellow highlighted button stating, "Allow All." Beneath the "Allow All" button, the banner provided a mechanism to "Manage Consent Preferences." The mechanism consisted of two rows of text with a plus sign ( + ) to the left of words. The first row stated, "Strictly Necessary Cookies," and to the right of this text in blue the words "Always Active." The second row stated, "Sale of Personal Data." To the right of this text appears a toggle button or switch, the left half of which was filled with a white circle. This indicated that the button or switch was in an "off" position, meaning that sale of the reviewing visitor's personal data had been rejected as a preference. Plaintiff did not alter the button or switch to the right of "Sale of Personal Data." Reviewing the

CLASS ACTION COMPLAINT

20

banner, she clicked a yellow highlighted "Confirm My Choices" button below, indicating that she had set her consent preferences to prohibit the sale of her personal data.

67.    Expanding the row consisting of the words "Sale of Personal Data" by clicking on the plus sign directly to the left, reveals the following text:

Under the California Consumer Privacy Act, you have the right to opt-out of the sale of your personal information to third parties. These cookies collect information for analytics and to personalize your experience with targeted ads. You may exercise your right to opt out of the sale of personal information by using this toggle switch. If you opt out we will not be able to offer you personalised ads and will not hand over your personal information to any third parties. Additionally, you may contact our legal department for further clarification about your rights as a California consumer by using this Exercise My Rights link. If you have enabled privacy controls on your browser (such as a plugin), we have to take that as a valid request to opt-out. Therefore we would not be able to track your activity through the web. This may affect our ability to personalize ads according to your preferences.

**Analytical/Performance Cookies**

These allow us to recognize and count the number of visitors and to see how visitors move around our website when they are using it. This helps us to improve the way our website works, for example, by ensuring that users are finding what they are looking for easily.

CLASS ACTION COMPLAINT

21

**Advertising Cookies**

These Cookies record your visit to our website, the pages you have visited and the links you have followed. We will use this information to make our website and the advertising displayed on it more relevant to your interests. We may also share this information with third parties for this purpose.

68.    In short, Plaintiff reviewed the information provided by Defendant to her through Defendant's consent management system or interface, and opted out of the sale of her data.  Under California statute – namely the California Consumer Privacy Act of 2018, Civil Code § 1798.100 *et seq.* (the "CCPA") – the reference to the visitor's choice regarding the "sale" of her data in Defendant's consent mechanism refers to the dissemination of the data to third parties.  Cal. Civ. Code § 1798.140 defines "sale" as (emphasis supplied):

selling, renting, releasing, ***disclosing, disseminating, making available, transferring***, or otherwise communicating orally, in writing, or by electronic or other means, a consumer's personal information[17] by the business to a third party for monetary or other valuable consideration.

---

[17] The data collected as part of the browser fingerprinting process that Defendant's Website initiates fall within "personal information" as used in the CCPA.  The CCPA defines "personal information" as "information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."  § 1798.140(o)(1).  Such information expressly includes "[i]nternet or other electronic network activity information," such as "browsing history, search history, and information regarding

69. Once Plaintiff – and all visitors to the Website – who, upon encountering Defendant's consent banner, opted out of the "Sale of Personal Data" in the manner described *supra*, they were then able to browse the Website as the consent window(s) or interface disappeared from their screens.

70. As demonstrated with respect to Plaintiff's November 4, 2025 visit to the Website in a recording known as a "HAR File," after Plaintiff 'confirmed her choices,' the code deployed on Defendant's Website described *supra* continued transmitting Plaintiff's personal information – i.e., information that could be reasonably linked to her and/or reasonably likely to identify her – to third parties including ZoomInfo, LinkedIn and X Corp.  In other words, Plaintiff's exercise of her option to choose to proceed without third-party selling or sharing of data, had no impact on the transmission of data to the third parties via the Website.

71. The type of data that continued to be shared with ZoomInfo, LinkedIn and X Corp. *after* Plaintiff 'confirmed her choices' was similar or identical to the data collected by the ZoomInfo, LinkedIn and X Corp. software described above before she interacted with Defendant's consent mechanism.  The same can be said of the data shared from visitors to the Website similarly situated to Plaintiff after they 'confirmed their choices' to opt out of data-selling and data-sharing.

72. Defendant's consent banner(s) as described herein, led Plaintiff, and all Website visitors similarly situated to Plaintiff, to believe that their personal data, as defined in the CCPA, would not be sold, disclosed, disseminated, made available or transferred to third parties including ZoomInfo, LinkedIn and X Corp.  Plaintiff, and such visitors, therefore relied to their detriment on Defendant's representations about the sharing and selling of visitor data.  Defendant intended for such reliance to occur

---

a consumer's interaction with an internet website, application, or advertisement." *Id*. It also includes "geolocation data."  *Id*.

CLASS ACTION COMPLAINT

23

because it profited through the continued operation of the ZoomInfo, LinkedIn and X Corp. code on the Website.

73. Defendant's misrepresentations and omissions about the ability of Plaintiff and other visitors to the Website similarly situated to Plaintiff to prevent or halt the sale or sharing of their data by 'confirming their choices' through Defendant's consent mechanism were known exclusively to, and actively concealed by Defendant. The misrepresentations and omissions were not reasonably known to Plaintiff and members of the putative class. Further, Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and putative Class members as to whether to stay on, and use, the Website. The misrepresentations and omissions were material at the time made, because, when presented with Defendant's consent banner, Plaintiff and putative Class members were presented with an option to leave the Website rather than have their data sold or shared with third parties.

74. Defendant profited from its misrepresentations and omissions regarding data selling and sharing, because such activities, *inter alia*, permits Defendant to market and advertise its services more efficiently and more effectively. Further, these surveillance activities lead to more successful placements of candidates for positions at Defendant's clients.

## CLASS ALLEGATIONS

75. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons who, while located in California, upon encountering the consent interface on the Website, opted out of the "Sale of Personal Data" and thereupon continued viewing or browsing the Website.**

76.     This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

77.     NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

78.     COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

      a.  Whether Defendant's actions violate California common or statutory law;

      b.  Whether Plaintiff and Class members are entitled to statutory damages;

      c.  Whether Plaintiff and Class members are entitled to punitive damages;

      d.  Whether Plaintiff and Class members are entitled to injunctive relief;

      e.  Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

      f.  Whether Plaintiff and Class members are entitled to the disgorgement of profits.

79.     TYPICALITY: Plaintiff is asserting claims that are typical of the Class because while in California, (a) she opted out of the "Sale of Personal Information" using the Website's consent interface (a consent banner and click throughs), (b) she remained on and browsed the Website upon opting out, and (c) data about her

CLASS ACTION COMPLAINT

25

(including her device and browser) was transmitted to ZoomInfo, LinkedIn and X Corp., and possibly other third parties, for fingerprinting and tracking purposes.

80.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

81.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Invasion of Privacy

82.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

83.    By installation of third-party tags and codes as described herein, and use of a deceptive consent mechanism, Defendant has intruded upon legally protected privacy interests of Plaintiffs and members of the Class.

84.    The privacy interests so implicated are protected under (a) the California Invasion of Privacy Act Cal. Penal Code § 630 *et seq.* ("CIPA"), and within CIPA, Cal. Penal Code § 638.51 (the "California Trap and Trace Law"); (b) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" (c) the California Constitution; and (d) the Fourth Amendment to the U.S. Constitution.

85.    Plaintiff and Class members had an objectively reasonable expectation of privacy under the circumstances upon visiting the Website, which represented to

them that they could 'confirm their choices' to stop the sharing and selling of data to third parties that could identify them and their consumer behavior, and permit ongoing tracking of their internet browsing.  They reasonably believed that Defendant would not permit ZoomInfo, LinkedIn and X Corp., and possibly other third parties, to store and send cookies and/or use the tracking technology described *supra* on the devices of Plaintiff and Class members.  They also reasonably believed that Defendant would not permit ZoomInfo, LinkedIn and X Corp., and possibly other third parties, to track and collect Plaintiff's and Class members browsing history, visit history, website interactions, shopping behavior, demographic information, referring URLs, session information, user identifiers and/or geolocation data.

86.    Such information falls within the definition of "personal information" under Cal. Civ. Code § 1798.140.

87.    In violation of the reasonable expectation of privacy of Plaintiff and other members of the Class, and without their consent, Defendant allowed code on its website to use cookies and other tracking technologies to collect, track and compile the personal information of Plaintiff and Class members for and by ZoomInfo, LinkedIn, X Corp. and possibly other third parties.  The data that Defendant allowed to be collected by these third parties allows the third parties to, *inter alia*, do the following (which ZoomInfo, LinkedIn and X Corp. actually do): (1) create individual profiles of Plaintiff and Class members (containing the types of personal information described herein); and (2) conduct targeted marketing, aiming certain marketing to identified persons.  The consumer profiles thus created for Plaintiff and Class members can be used to further invade these persons' privacy by allowing ongoing tracking, even on websites that encourage and allow persons to enter highly sensitive personal information.

88.    Defendant's use of the ZoomInfo, LinkedIn and X Corp. code and tags on the Website constitutes a serious invasion of privacy given the context and the

type of information about Plaintiff and Class members that gets collected either while they are on the Website or that gets collected through ongoing tracking facilitated by the Website's transmission of personal information about them to ZoomInfo, LinkedIn and X Corp.

89. Defendant was not justified in perpetrating the invasion of privacy alleged herein. The invasion served no legitimate business purpose.

90. Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are therefore entitled to compensatory damages, which includes monetary damages.

91. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the ZoomInfo, LinkedIn and X Corp. code and tags on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website. Defendant's actions were made in conscious disregard of the choice Plaintiff and Class members believed they had exercised to stop the sharing with and selling to third parties of their personal data.

92. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion

93. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

94. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a

CLASS ACTION COMPLAINT

28

manner that would be highly offensive to a reasonable person.

95. Defendant's deployment of ZoomInfo, LinkedIn and X Corp. code and tags on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The continued operation of the code and tags after Plaintiff and Class members 'confirmed their choices' to opt out of data-sharing and data-selling placed ZoomInfo, LinkedIn and X Corp., and possibly other third parties, in a conversation Plaintiff and the Class members had every reason to believe was between them and Defendant only.  The intrusion allowed ZoomInfo, LinkedIn and X Corp. to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

96. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the ZoomInfo, LinkedIn and X Corp. code and tags on the Website.

97. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website, particularly in light of Defendant's representation to them that they could 'confirm their choices' to stop the sharing and selling of data to third parties that could identify them and their consumer behavior, and permit ongoing tracking of their internet browsing. They reasonably believed that Defendant would not permit ZoomInfo, LinkedIn and X Corp., and possibly other third parties, to store and send cookies and/or use the tracking technology described *supra* on the devices of Plaintiff and Class members.  They also reasonably believed that Defendant would not permit ZoomInfo, LinkedIn and X Corp., and possibly other third parties, to track and collect Plaintiff's and Class members browsing history, visit history, website interactions, shopping behavior, demographic information, referring URLs, session information, user identifiers and/or geolocation data. Plaintiff's reasonable expectation of privacy was also based on California criminal and civil laws that protect individuals' privacy when located in the state.

98. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

99. The intrusion described herein would be highly offensive to a reasonable person because (i)(a) it continued to occur after Defendant falsely represented to Plaintiff and Class members that they could stop or prevent it, and (b) Plaintiff and Class members opted out of data-sharing and data-selling; and (ii) it enabled ongoing tracking of the internet browsing activity of Plaintiff the Class members.

100. Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are there entitled to compensatory damages, which includes monetary damages.

101. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the ZoomInfo, LinkedIn and X Corp. code and tags on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

102. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## THIRD CAUSE OF ACTION

### Violations of California Trap and Trace Law

**Cal. Penal Code § 638.51 (the "California Trap and Trace Law")**

103. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

104. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

105. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

106. Each of the ZoomInfo code, the LinkedIn Insight Tag and the X Corp. code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

107. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

108. Each of the ZoomInfo code, the LinkedIn Insight Tag and the X Corp. code is designed to identify *to a reasonably likely degree* the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses

emanating from the devices that are "incoming" to the Website. The "**sources**" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

109.   Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication" constitutes a trap and trace device under §§ 638.50-51. *See, e.g., Alex & Ani, LLC*, 2026 LX 10546, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 LX 518344, at *21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 LX 509487, at *39-42 (C.D. Cal. Dec. 4, 2025); *Garon v. Keleops USA, Inc.*, 2025 LX 383838, at *10-15 (N.D. Cal. Sep. 2, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

110.   Defendant did not obtain a court order before using or installing each of the ZoomInfo code, the LinkedIn Insight Tag and the X Corp. code on the Website.  Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

CLASS ACTION COMPLAINT

32

111.   Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through ZoomInfo, LinkedIn or X Corp.  Indeed, Plaintiff and the Class members expressly opted out of such data-sharing or data-selling through the consent interface on the Website.

112.   Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5).  The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service."  Defendant is not such a provider.

113.   CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

114.   Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## FOURTH CAUSE OF ACTION

### Fraud, Deceit and/or Misrepresentation

115.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

116.   Defendant fraudulently and deceptively represented to Plaintiff and Class members that they could choose to opt out of the "sale" of "personal information", as those terms are defined in the CCPA, confirm such choice and that Defendant would honor those decisions.

117.   The representations were false and deceptive, and omitted material facts, because after Plaintiff and the Class members opted out of the sale of personal information, the ZoomInfo, LinkedIn and X Corp. code and tags continued to operate on the Website as to them, transmitting the personal data of Plaintiff and the Class members to ZoomInfo, LinkedIn and X Corp.  Further, on information and

CLASS ACTION COMPLAINT

33

belief, Defendant, through the ZoomInfo, LinkedIn and X Corp. code and tags on the Website, continued to cause cookies and software to be stored on the devices of Plaintiff and Class members that could be used for ongoing tracking of them by ZoomInfo, LinkedIn and X Corp.

118. Defendant's misrepresentations and omissions about these matters were known exclusively to, and actively concealed, by Defendant. They were not reasonably known to Plaintiffs and Class members at the time they were made. Defendant knew, or should have known, how its Website functioned, and how the ZoomInfo, LinkedIn and X Corp. code and tags deployed on the Website operated – including whether any changes to their operation occurred after a visitor opted out of data-sharing with and data-selling to third parties using Defendant's consent interface. Defendant also knew, or should have known, whether the code and tags in question continued to cause cookies and software to be stored on the devices of visitors that could be used for ongoing tracking of them by ZoomInfo, LinkedIn and X Corp. after such visitors opted out of the data-sharing and data-selling.

119. Defendant's misrepresentations and omissions about the ability of Plaintiff and the Class members to opt out were material when made because they concerned facts that were critical to the decision of Plaintiff and Class members whether to remain on and/or continue browsing the Website. Plaintiff and the Class members could have terminated their visits to the Website if they had learned that their "personal information" would in fact be sold or shared to or with third parties through the Website.

120. By making the misrepresentations and omission, Defendant breached its duty to Plaintiff and the Class members. Defendant also profited from its breach, because the sharing of the personal data and Class members made Defendant's marketing and advertising more efficient and effective through targeting with the assistance of ZoomInfo, LinkedIn and X Corp. Plaintiff believes that additional

CLASS ACTION COMPLAINT
34

ways in which Defendant profited from the fraudulent and deceptive data-sharing and data-selling described herein will be revealed through discovery.

121. Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment – by informing them that they could use the Website without any data-sharing and data-selling with or to third parties. Operating under the mistaken belief that they had chosen to opt out of such data-sharing and data-selling, Plaintiff and Class members allowed more of their personal information to be shared with and sold to third parties than they would have otherwise.

122. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Such reliance was justifiable and reasonable. There was nothing to indicate to Plaintiff or Class members that Defendant's consent interface contained misrepresentations and/or fraudulent omissions.

123. Plaintiff and Class members were injured as a direct and proximate result of Defendant's misrepresentations and fraudulent omissions, and their reasonable and justifiable reliance thereupon. Their injuries include the loss of money and/or property. The data of Plaintiff and Class members fraudulently and deceptively transferred to ZoomInfo, LinkedIn and X Corp. have economic value. Defendant's fraudulent and deceptive data-sharing and data-selling with or to ZoomInfo, LinkedIn and X Corp. diminished the value of the personal information of Plaintiff and Class members that was shared and sold. Further, the data-sharing and data-selling injured the right of Plaintiff and Class members to control the distribution of their personal information, and the ways in which that information has been used, and currently is being used, by third parties.

124. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's misrepresentations and omissions concerning the use of the ZoomInfo, LinkedIn and X Corp. code and tags on the Website were made in a malicious, oppressive and willful manner. These misrepresentations and omissions

were made in conscious disregard of the choice selected by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

125.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

126.   Defendant intentionally aimed at increasing its sales and profits, improving its marketing and advertising while making it more cost-effective, through its misrepresentations and fraudulent omissions concerning the choice of Website visitors to opt out of sharing their personal information with third parties.

127.   There is no legitimate business reason justifying Defendant's use of misrepresentations and fraudulent omissions concerning the choice of Website visitors to opt out of sharing their personal information with third parties to benefit itself financially and commercially.

128.   Plaintiff and Class members conferred an economic benefit on Defendant through their decision to continue using the Website after they attempted to opt out of data-sharing and data-selling with or to third parties.

129.   Defendant has been unjustly enriched by its conduct at the expense of Plaintiff and Class members.

130.   Defendant understood the economic benefit it received from its unlawful behavior with respect to Plaintiff and Class members.  Indeed, Defendant engaged in the unlawful conduct alleged herein in order to obtain the economic benefit it received from Plaintiff and Class members – and from all other visitors to the Website.

131.   It would be unjust for Defendant to retain benefits and profits it received based on the value of the personal information shared by Defendant with

ZoomInfo, LinkedIn and X Corp. because that data-sharing was conducted unlawfully and wrongfully, and without the consent of Plaintiff and Class members.

132.   Plaintiff and Class members are entitled to restitution of the benefits so received by Defendant.  Further, they are entitled to any amounts required to place them in the position they occupied prior to the data-sharing with and data-selling to ZoomInfo, LinkedIn and X Corp. perpetrated by Defendant.

<b><u>PRAYER</u></b>

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1.    An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;

2.    An award of compensatory damages, including statutory damages pursuant to CIPA;

3.    An award of punitive damages;

4.    An award of nominal damages;

5.    An order for full restitution;

6.     An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7.    An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8.    Reasonable attorneys' fees and costs; and

9.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

CLASS ACTION COMPLAINT

37

DATED: February 25, 2026                TAULER SMITH LLP


By:  */s/ J. Evan Shapiro*
      J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Meghann Percy*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED: February 25, 2026                    TAULER SMITH LLP


By: */s/ J. Evan Shapiro___*
        J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Meghann Percy*